# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 14-2779

CLIFFORD H. COX, APPELLANT,

V.

ROBERT A. MCDONALD,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued August 25, 2016                    Decided November 7, 2016)

*Katy S. Clemens*, of Washington, D.C., argued for the appellant.

*Julia Turner*, with whom *Leigh A. Bradley*, General Counsel; *Mary Ann Flynn*, Assistant General Counsel; *Kenneth A. Walsh*, Deputy Assistant General Counsel; and *Daenia L. Peart*, all of Washington, D.C., were on the brief for the appellee.[1]

Before DAVIS, *Chief Judge*, and KASOLD and PIETSCH, *Judges*.

PIETSCH, *Judge*: The appellant, veteran Clifford H. Cox, appeals through counsel a May 20, 2014, decision of the Board of Veterans' Appeals (Board) that, among other things, denied claims for service connection for a back disability and a bilateral knee disability.[2] Record (R.) at 2-14. This appeal is timely, and the Court has jurisdiction to review the Board's May 2014 decision pursuant to 38 U.S.C. §§ 7252(a) and 7266(a). This matter was referred to a panel of the Court with oral argument to address whether the appellant's service in Afghanistan qualifies him as eligible for compensation for an undiagnosed illness under the special presumptive service-connection

---

[1] The panel wishes to recognize and commend counsel for both parties who argued before the panel on August 25, 2016, for their outstanding preparation and oral advocacy skills.

[2] The Board also remanded the issues of entitlement to an initial disability rating in excess of 30% for post-traumatic stress disorder (PTSD) and entitlement to a total disability rating based on individual unemployability. The Court does not have jurisdiction to address the remanded issues. *See* 38 U.S.C. § 7266(a); *Breeden v. Principi,* 17 Vet.App. 475 (2004).

provisions for which veterans of the Persian Gulf War are eligible, found at 38 U.S.C. §1117 and 38 C.F.R. § 3.371(b), and whether, therefore, the Board erred in not considering these provisions when deciding the appellant's claims.[3]  For the reasons set forth below, the Court will affirm the Board's May 20, 2014, decision as to service connection for a back disability and a bilateral knee disability.

## I. BACKGROUND

Mr. Cox served on active duty in the U.S. Army from March 6, 2007, to June 25, 2010, including service in Afghanistan in support of Operation Enduring Freedom from January 12, 2009, to December 29, 2009.  R. at 51.  He has testified that, while in Afghanistan, he began to experience pain in both his back and knees.  R. at 94-95, 217-18.

On February 4, 2010, VA issued Training Letter 10-01, which included the following language:

> Although the initial directives for adjudicating disability patterns associated with Gulf War service were intended to assist Veterans of the 1990-91 Persian Gulf War, they remain in effect today and must be applied to all veterans with Southwest Asia service.  The regulatory definition of a "Persian Gulf Veteran" provided in § 3.317 includes service in a large area of Southwest Asia, but does not include Afghanistan. Considering the importance of current U.S. military operations in Afghanistan and its environmental similarity to all other regions of Southwest Asia, C&P [(Compensation & Pension)] Service has determined that Veterans with service in Afghanistan fall under all laws related to Gulf War and southwest Asia service.  A regulatory amendment to make this official is forthcoming.

Training Letter 10-01 (February 4, 2010); *see* Appellant's Brief (App. Br.) Exhibit A, pg.3.

In August 2010, Mr. Cox submitted a claim for service connection for various disabilities, including back and knee problems.  R. at 628-42.  That same month, Mr. Cox received VA outpatient treatment.  R. at 582-88.  The healthcare provider noted a past medical history of lumbago and arthralgia of the knee. R. at 583.  The healthcare provider ordered x-ray examinations

---

[3]The appellant does not contest the Board's finding that he has no current diagnosis of a back or a knee disability that would meet the requirement of a current disability under a theory of direct service connection.  *See Davidson v. Shinseki*, 581 F.3d 1313 (Fed. Cir. 2009); *Hickson v. West*, 12 Vet.App. 247, 253 (1999).  Therefore, the Court will not address the issue of entitlement to direct service connection.

of the back and knees. An x-ray of the lumbosacral spine showed a normal vertebral body and disc heights. R. at 228-29. There was no evidence of malignancy or spondylosis. *Id.* An x-ray of the bilateral knees was negative for any abnormalities. R. at 226-28.

In September 2010, Mr. Cox underwent a general VA examination. R. at 558-69. He reported that he believed that his thoracic spine and bilateral knee pain was due to "the amount of equipment he had to carry and kneeling that was required" during service. R. at 558; *see* R. at 93-94, 217-19. On physical examination, no abnormalities were identified with regard to the spinal muscles. R. at 564-65. There was no evidence of spinal ankylosis or fractures of one or more of the vertebral bodies. R. at 565. In addition, no abnormalities were noted as to any of the joints, including swelling, effusion, tenderness, or laxity. R. at 564. An x-ray of the thoracic spine was normal. R. at 567. The diagnosis included "no clinical evidence of any acute or chronic conditions or any residuals thereof." *Id.*

In October 2010, VA withdrew its initial Training Letter 10-01 and issued a revised version that did not state that it had been revised from the earlier version. *See* App. Br., Exhibit B (text of revised Training Letter 10-01). In his brief, the appellant stated that "[o]n June 10, 2015, VA counsel informed counsel for [the] [a]ppellant in this case that the Compensation and Pension Service had informed her that the [training letter] was revised in October 2010." App. Br. at 3-4. The revised Training Letter10-01 deleted the above language to the extent that it included veterans with service in Afghanistan as qualifying for disability compensation based on undiagnosed illnesses or medically unexplained chronic multisymptom illnesses.

In October 2010, a regional office (RO) denied Mr. Cox's claims for service connection for the back and knees. R. at 489-501. The RO concluded that there was no medical evidence of a current diagnosis of any back or knee condition. R. at 498. According to an October 2010 VA treatment record, Mr. Cox had possible patellofemoral symptoms. R. at 253. However, the healthcare provider did not render a specific diagnosis. *Id.;see* R. at 143-200 (VA treatment records from December 2010 to May 2011).

Thereafter, Mr. Cox submitted a Notice of Disagreement (NOD) with the October 2010 RO decision. R. at 486. In December 2010, the RO issued a Statement of the Case (SOC). R. at 338-57. Mr. Cox perfected his appeal. R. at 317. In February 2011, Mr. Cox testified before a

decision review officer. R. at 212-24. The RO issued a Supplemental SOC in May 2011. Mr. Cox testified before the Board in February 2012. R. at 69-106.

The Board issued the current decision on appeal in May 2014. It concluded that the medical evidence did not reflect a current diagnosis of a back or knee disability. R. at 7, 9. With regard to Mr. Cox's past medical history of lumbago, the Board explained that pain alone, without a diagnosed or identifiable underlying condition, did not constitute a disability for VA compensation purposes. R. at 7. The Board rendered this same finding with regard to the past medical history of arthralgia of the knee and possible patellofemoral symptoms. R. at 9. Furthermore, the Board noted that the September 2010 VA examination diagnosis was negative for any back or knee conditions. R. at 6-7, 9. The Board also noted that VA treatment records did not reveal any diagnoses regarding the back or knees. *Id*.; *see* R. at 143-200. Finally, the Board also found that Mr. Cox's service treatment records did not reveal any diagnoses regarding the back or knees. R. at 7, 9; *see* R. at 29-48. Based on such evidence, the Board denied Mr. Cox's claims. R. at 10. This appeal followed.

## II. THE PARTIES' ARGUMENTS

The appellant argues that the Board erred by failing to apply the "Gulf War provisions," found at section 1117 and § 3.317(b), to his back and knee claims, based on his service in Afghanistan. App. Br. at 6-7. He contends that the plain language of the term "Southwest Asia theater of operations," found in section 1117, specifies that Afghanistan is included in this statutory term. *Id.* at 8-9.

In support of this argument, he asserts that the U.S. Court of Appeals for the Federal Circuit's recent holding in *Joyner v. McDonald*, 766 F.3d 1393, 1395 (Fed. Cir. 2014), together with "the plain language of § 1117 makes clear that pain alone, such as muscle pain or joint pain [experienced by the appellant], may establish an undiagnosed illness that causes a qualifying chronic disability." App. Br. at 7. He further notes that "there is medical and lay evidence of record of the pain, soreness, and tightness that he experiences in his back and knees" that the Board found credible. *Id.* at 8.

4

In the alternative, the appellant argues that VA Training Letter 10-01, as it was written in February 2010, created a substantive rule or regulation and that VA was "required to publish in the Federal Register notice of the proposed rule and allow comment from interested parties" as specified by the Administrative Procedure Act (APA), 5 U.S.C. § 552, before the agency was permitted to change it, as it did in October 2010. App. Br. at 11-13. Finally, the appellant argues, also in the alternative, that VA's interpretation of section 1117 that Afghanistan is not part of the "Southwest Asia theater of operations" is arbitrary and capricious. *Id.* at 13-17.

The Secretary asserts that the statute is silent as to whether Afghanistan is included in the "Southwest Asia theater of operations" and, because Congress expressly delegated to the Secretary in section 1117 the authority to promulgate regulations that describe the "geographical area or areas of military service for which compensation may be paid" under section 1117, then § 3.317(e)(2), in which VA defines the term "Southwest Asia theater of operations" as "Iraq, Kuwait, Saudi Arabia, the neutral zone between Iraq and Saudi Arabia, Bahrain, Qatar, the United Arab Emirates, Oman, the Gulf of Aden, the Gulf of Oman, the Persian Gulf, the Arabian Sea, the Red Sea, and the airspace above these locations," is of controlling weight. Secretary's (Sec'y) Br. at 6-7. The Secretary also contends that the original Training Letter 10-01 is not a substantive rule that required public notice and comment to rescind. *Id.* at 16. Finally, the Secretary asserts that the issue of the applicability of the Gulf War provisions was not reasonably raised by the record and, therefore, the Board was not required to address this issue. *Id*. at 17.

## III. ANALYSIS

### A. Statutory & Regulatory Interpretation of 38 U.S.C. § 1117

#### 1. What is the Plain Meaning of "Southwest Asia theater of operations"?

The Court reviews the interpretation of statutes and regulations de novo. *Bradley v. Peake*, 22 Vet.App. 280, 290 (2008). When, as here, the Court is reviewing "an agency's construction of the statute which it administers," a court must first ask "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). If so, the court and the agency must "give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. On the other hand, if the statute is silent or ambiguous with respect to

the specific issue, the question for the court becomes whether the agency's interpretation is based on a permissible construction of the statute. *Id.* at 843. The Supreme Court further explained:

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.

*Id.* at 843-44.

In this case, the statute at issue is 38 U.S.C. §1117, which provides for presumptive service connection for veterans who have certain "qualifying chronic disabilities," including both diagnosed and undiagnosed illnesses, and who served in "the Southwest Asia theater of operations during the Persian Gulf War." 38 U.S.C. §1117(a)(1)(A). Congress, in the same statute, delegated to VA the authority to promulgate regulations that define the "geographical area or areas of military service" to which the statute applies but did not define the term "Southwest Asia theater of operations" or specifically direct the Secretary to define this term. 38 U.S.C. §1117(d).

Both parties assert that the plain meaning of the term "Southwest Asia theater of operations" supports their position. The appellant contends that the plain language of section 1117 specifies that Afghanistan is included in the term "Southwest Asia theater of operations." App. Br. at 8-10. In support, he asserts that when a country joins the "Southwest Asia theater of operations," as he asserts Afghanistan did via Executive Order 13239 in December 2001, then "the plain language of the statute mandates that those countries be included" in the statutory term. *Id.* at 10. He also cites to various geographical sources that purport to include Afghanistan as part of "Southwest Asia." *Id.* at 8-10. The Secretary contends that the plain language of this term specifies that Afghanistan is not so included both because the statute is silent as to what countries are included in that term and because the statute explicitly directs the Secretary to describe the "geographical area or areas of military service in connection with which compensation under [section 1117] may be paid." Sec'y Br. at 7.

The Court agrees with the Secretary's analysis and concludes that the statute is silent or ambiguous regarding the countries included in the term "Southwest Asia theater of operations." At the outset, two facts are noted. First, when Congress promulgated section 1117, it could not have known about the occurrence of the terrorist attacks of September 11, 2001, and the subsequent U.S.

6

Operation Enduring Freedom in Afghanistan, such that it is clear that Congress could not have intended "Southwest Asia theater of operations" to include Afghanistan when section 1117 was first enacted in 1994. Second, Executive Order 13239 says nothing about Afghanistan being included in the "Southwest Asia theater of operations"; rather, it simply designates the commencement of combatant activities with Afghanistan and the airspace above.

Equally significant, Congress chose not to identify the countries, regions, or geographical areas included in the "Southwest Asia" term, nor did it provide a definition of the term. Indeed, the fact that the parties, in their briefs and at oral argument, could not agree as to the countries that should be included as part of the "Southwest Asia" region and cited different authorities supporting their positions reveals that the plain meaning of this term is not clear from the statute itself. *See Tallman v. Brown*, 7 Vet.App. 453, 461 (1995) (holding that ambiguity exists when a statute can be interpreted by reasonably well-informed people in two or more ways), *rev'd on other grounds*, 105 F.3d 613 (Fed. Cir. 1997); *see also Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context . . . .").

Further, here, the statute is not only silent as to the definition of "Southwest Asia theater of operations," but, in section1117(d), Congress also explicitly and unambiguously left a gap for VA to fill by delegating to the agency the determination of the "geographical area or areas of military service" to which the statute applies. Therefore, the Court is obligated to give *Chevron* deference to VA's determination–found in its definition of "Southwest Asia theater of operations" at 38 C.F.R. § 3.317(e)–of the geographical areas in which veterans must have served in order to be eligible for the section 1117 service-connection presumptions, unless this determination is found to be "arbitrary, capricious, or manifestly contrary to the statute." *Chevron,* 467 U.S. at 844; *Vassallo v. Dep't of Defense*, 797 F.3d 1327, 1331-32 (Fed. Cir. 2015) (finding that, because Congress expressly directed the Office of Personnel Management to "'elucidate a specific provision of the statute by regulation'", those regulations "warrant 'controlling weight.'") (quoting *Chevron*, 467 U.S. at 843-44); *see also Corley v. United States*, 556 U.S. 303, 315 (2009) ("'A statute should be construed to give effect to all its provisions, so that no part will be inoperative, superfluous, void, or insignificant.'" (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

*2. Is VA's Regulatory Definition of "Southwest Asia theater of operations"*

*Arbitrary and Capricious?*

Having found section 1117 silent or ambiguous with respect to the specific issue of the definition of "Southwest Asia theater of operations" and that deference to VA's interpretation is required, the question for the Court becomes whether the agency's interpretation is based on a permissible construction of the statute or is instead arbitrary, capricious, or manifestly contrary to the statute. *See Mayo Foundation for Medical Educ. and Research v. United States*, 562 U.S. 44, 53 (2011) (holding that, under *Chevron* step two, courts "may not disturb an agency rule unless it is arbitrary or capricious in substance, or manifestly contrary to the statute" (internal quotations omitted)); *see also Taylor v. McDonald*, 27 Vet.App. 158, 164 (2014) (applying "arbitrary and capricious" standard to question of whether, under *Chevron* step two, the part of 38 C.F.R. § 3.309(e) providing for the rebuttal of the presumption of service connection applicable to the appellant's disability conflicts with 38 U.S.C. § 1113, rendering that part of the regulation contrary to law).

Further, when interpreting an administrative regulation that leaves a pertinent issue unresolved, deference must be afforded to VA's interpretation of that regulation, as long as that interpretation is not "plainly erroneous or inconsistent with the regulations" and there is no reason to suspect that it does not reflect the Secretary's fair and considered judgment on the matter in question. *Smith v. Nicholson,* 451 F.3d 1344, 1349-50 (Fed. Cir. 2006) (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945); *Meedel v. Shinseki*, 23 Vet.App. 277, 281 (2009). In addition, such deference is afforded to an agency's interpretation of its own regulations even when that interpretation is offered in informal rulings such as in a litigating document. *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1363-64 (Fed. Cir. 2005); *Am. Express Co. v. United States*, 262 F.3d 1376, 1382-83 (Fed. Cir. 2001).

The appellant asserts that the Court should find that the Secretary's interpretation of section 1117 that veterans who served in Afghanistan are not eligible for the service-connection presumptions afforded in it is arbitrary and capricious because the agency did not consider all relevant factors, including the purposes for which section 1117 was originally promulgated and the fact that VA and the National Academy of Sciences (NAS) have both recognized that veterans who served in Afghanistan face "many if not all" of the same exposures faced by veterans who served in

8

the other countries included in the Southwest Asia theater of operations. App. Br. at 13-17 (citing *Marlow v. Brown*, 5 Vet.App. 146, 151 (1993) (holding that, under the "arbitrary and capricious" standard, this Court must consider "'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment'")(quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))). Accordingly, in determining whether the Secretary's definition is arbitrary and capricious, the Court will address the legislative history of the statute's enactment and amendment, the regulatory history in which the regulation was promulgated and amended, and evidence that veterans who served in both Afghanistan and the other countries included in the "Southwest Asia theater of operations" faced the same or similar exposures to environmental hazards.

Section 1117 was first enacted in 1994 as part of the Veterans' Benefits Improvements Act of 1994. Public Law 103-446 (November 2, 1994); 108 Stat. 4645. In the act, Congress made the following findings, among others:

> (1) During the Persian Gulf War, members of the Armed Forces were exposed to numerous potentially toxic substances, including fumes and smoke from military operations, oil well fires, diesel exhaust, paints, pesticides, depleted uranium, infectious agents, investigational drugs and vaccines, and indigenous diseases, and were also given multiple immunizations. It is not known whether these servicemembers were exposed to chemical or biological warfare agents. However, threats of enemy use of chemical and biological warfare heightened the psychological stress associated with the military operation.
>
> (2) Significant numbers of veterans of the Persian Gulf War are suffering from illnesses, or are exhibiting symptoms of illness, that cannot now be diagnosed or clearly defined. As a result, many of these conditions or illnesses are not considered to be service connected under current law for purposes of benefits administered by the Department of Veterans Affairs.

*Id.* Congress also stated the following purposes for the act, among others:

> (1) to provide compensation to Persian Gulf War veterans who suffer disabilities resulting from illnesses that cannot now be diagnosed or defined, and for which other causes cannot be identified;
> (2) to require the Secretary of Veterans Affairs to develop at the earliest possible date case assessment strategies and definitions or diagnoses of such illnesses.

*Id.*

9

In 1995, VA promulgated § 3.317, which states that compensation under section 1117 is available to veterans who had active service in the "Southwest Asia theater of operations," which it defined as "Iraq, Kuwait, Saudi Arabia, the neutral zone between Iraq and Saudi Arabia, Bahrain, Qatar, the United Arab Emirates, Oman, the Gulf of Aden, the Gulf of Oman, the Persian Gulf, the Arabian Sea, the Red Sea, and the airspace above these locations." 38 C.F.R. § 3.317(e)(2); *see* 60 Fed. Reg. 6665 (1995).

Thereafter, Congress amended section 1117 on December 27, 2001, to expand the definition of illnesses presumed to be service connected to include chronic multisystem illnesses (CMI) and to provide a list of the signs or symptoms that may indicate the presence of an undiagnosed illness; however, the amendments did not include (or otherwise provide for) a definition of "Southwest Asia theater of operations." 115 Stat. 988, 989 (December 27, 2001).

In March 2010, VA proposed to amend § 3.317 to allow for qualifying veterans who served in Afghanistan to be eligible for presumptive service connection if they have been diagnosed with certain infectious diseases. 75 Fed. Reg. 13055 (March 18, 2010). In the final rulemaking, VA added a new subsection 3.317(c) that included the infectious diseases amendments, but did not otherwise amend the regulation to provide for veterans who served in Afghanistan to be eligible for presumptive service connection for undiagnosed illnesses or chronic multisystem illnesses. 75 Fed. Reg. 59968 (September 29, 2010). VA also did not amend its definition of "Southwest Asia theater of operations" found in § 3.317(e) as part of these amendments. *Id.* Indeed, in the comments in the notice of final rulemaking, VA's representative stated that the question of amending § 3.317 to include veterans with service in Afghanistan was "outside the scope" of that rulemaking, which only covered the addition of § 3.317(c) for infectious diseases. *Id.*

As noted earlier, because Congress could not have known about the occurrence of the terrorist attacks of September 11, 2001, and the subsequent U.S. Operation Enduring Freedom in Afghanistan, it is clear that Congress could not have intended the term "Southwest Asia theater of operations" to include Afghanistan when section 1117 was first enacted in 1994. Further, when Congress amended the statute substantively in 2001 to include presumptive service connection for undiagnosed illnesses, it was cognizant of both the Executive Order that added Afghanistan as an area in which the United States was engaged in combat and, perhaps, some of the similarities

10

between the Afghanistan theater of operations and the "Southwest Asia theater of operations," as defined by VA. However, Congress did not act to amend the "geographical area or areas of service" under section 1117 and therefore, by inaction, expressed an intent for the veterans eligible for coverage under section 1117, as defined by VA, to remain the same.

Although the appellant has noted that there exist documented similarities between the environmental hazards encountered by troops in both the "Southwest Asia theater of operations" as defined by VA and Afghanistan,[4] based upon the legislative and regulatory history and the statutory context surrounding the original enactment of the statute, the Court concludes that VA's interpretation of section 1117, found in its definition of the term "Southwest Asia theater of operations," is not arbitrary and capricious. Its definition as including the geographical areas that

---

[4] VA recognized that veterans who served in Afghanistan faced similar exposures as those who served in Southwest Asia when it established the Airborne Hazards and Open Burn Pit Registry to follow the health effects on veterans who served in the Southwest Asia theater of operations, including in Iraq and Afghanistan. 79 Fed. Reg. 36142 (June 25, 2014).

The NAS, which was tasked with studying the health effects of Gulf War service on veterans (Pub. L. No. 105-277 § 1603, 112 Stat. 2681, 745 (1998); Pub. L. No. 105-368 § 101, 112 Stat. 3315, 2 (1998)), has for some time been studying Afghanistan veterans right along with Iraq veterans and others in the rest of Southwest Asia. *See, e.g.*, "Gulf War and Health Volume 5:Infectious Diseases" (2007), *available at* http://books.nap.edu/openbook.php?record_id=11765&page=1 ("At VA's request, the committee also examined infections that might have afflicted US military personnel deployed to south-central and southwest Asia for Operation Enduring Freedom (OEF) and Operation Iraqi Freedom (OIF)"); "Gulf War and Health Volume 6: Physiologic, Psychologic, and Psychosocial Effects of Deployment-Related Stress" (2008), *available at* http://books.nap.edu/openbook.php?record_id=11922&page=2 ("In recent years, the charge to IOM has been expanded to include not only veterans of the 1990-1991 Gulf War but veterans returning from OEF and OIF."); "Gulf War and Health Volume 7: Long Term Consequences of Traumatic Brain Injury" (2009), *available at* http://www.nap.edu/openbook.php?record_id=12436&page=1; "Gulf War and Health: Treatment for Chronic Multisymptom Illness" (2013), *available at* http://books.nap.edu/openbook.php?record_id=13539&page=16 ("Many symptoms reported by Iraq and Afghanistan war veterans, including headaches, chronic pain, disrupted sleep, fatigue, and attention and memory problems, overlap with symptoms experienced by 1991 Gulf War veterans.").

The Veteran's Benefits Act of 2010 directed VA to enter into a contract with NAS "to carry out a comprehensive review of the best treatments for CMI in Persian Gulf War veterans and an evaluation of how such treatment approaches could best be disseminated throughout [VA] to improve the care and benefits provided to veterans." P.L. 111-275, Sec. 805; 124 Stat. 2890 (October 2010). This act also mandated, in a separate section, that NAS "shall conduct a comprehensive review and evaluation of the available scientific and medical information regarding the health status of veterans who served in the Armed Forces in the Southwest Asia theater of operations during the Persian Gulf War or . . . *in a post-9/11 Global Theater of Operations* and the health consequences of exposures to risk factors during such service." Sec. 806; codified at 38 U.S.C. § 1117 Note (emphasis added). Subsequently, the NAS published several additional reports in its "Gulf War and . . . Health" series pursuant to this mandate, including Volume 8: Treatment for Chronic Multisymptom Illnesses (2013); Volume 9: Long-Term Effects of Blast Exposures (2014); and Volume 10: Update on Health Effects (2016).

11

were originally the theater of operations for Operation Desert Storm is a permissible construction of the statute, given the circumstances surrounding the statute's enactment, its stated purposes and findings, and the history of Congressional amendments to the statute.[5]

### B. Effect of VA Training Letter 10-01 on Appellant's Claim

The Court must next determine if VA's original Training Letter 10-01 created any substantive rights upon which the appellant may rely and, if so, whether the Secretary failed to follow the appropriate notice and comment procedures required under the APA when it rescinded those rights in the subsequent Training Letter.

This Court has held that VA's internal "[r]ules fall into two main categories: substantive or interpretive." *Fugere v. Derwinski*, 1 Vet.App. 103, 107 (1990). A substantive rule "has the force of law and narrowly limits administrative action." *Id*. In the course of judicial review, this Court makes its own assessment whether a particular VA rule or policy is substantive or interpretive. "'The particular label placed upon it by the [agency] is not necessarily conclusive, for it is the substance of what the [agency] has purported to do and has done which is decisive.'" *Fugere*, 1 Vet.App. at 107 (quoting *Columbia Broad. Sys., Inc. v. United States*, 316 U.S. 407 (1942)(alterations in original) (nullifying VA's attempt to change entitlement to benefits for hearing disability by rescinding an existing VA manual provision without resort to notice and comment procedures in the APA); *Hayes v. Brown*, 5 Vet.App. 60, 67 (1993) (VA M21-1 Manual provisions regarding PTSD, which preceded formal regulations, were "the equivalent of [VA] [r]egulations").

However, when VA's interpretation of a statute is clear from its existing regulations, any discrepancy between the VA's internal Adjudications Manual and the agency's properly promulgated regulations "does not confer any rights" on a claimant. *Haas v. Peake*, 525 F.3d 1168, 1197 (Fed. Cir. 2008). Further, in *Fournier v. Shinseki*, this Court held that, where an existing regulation defined the scope of the required notice to a veteran of denial of his or her claim from VA, the M21-1 provision at issue that required the notice to be in the form of a rating decision "does not establish or alter the criteria for benefits but only illuminates a suggested procedural practice for VA

---

[5]VA is encouraged to continuously review the appropriateness of an overall change to the definition of "Southwest Asia theater of operations" to explicitly include Afghanistan based on the facts, or, if needed, to petition Congress to change the section 1117 definition of "Southwest Asia theater of operations" to explicitly include the Afghanistan theater(s) of operation.

adjudicators." 23 Vet.App. 480, 487 (2010). In other words, the manual provision provided guidance but did not create a substantive right to notice in the form of a rating decision.

In this case, the first version of Training Letter 10-01, dated February 4, 2010, which was written by the Director of the C&P Service and addressed to all VA regional offices, stated, in part, under the heading "Qualifying Veterans":

> Considering the importance of current U.S. military operations in Afghanistan and its environmental similarity to all other regions of Southwest Asia, C&P Service has determined that Veterans with service in Afghanistan fall under all laws related to Gulf War and Southwest Asia service. A regulatory amendment to make this official is forthcoming.

Training Letter 10-01 (February 4, 2010); *see* App. Br. Exhibit A, pg.3. The second version of the letter is also dated February 4, 2010, and, indeed, is identical to the first letter except that the above-quoted language was omitted and replaced with the following language:

> C&P Service has proposed amending § 3.317 by adding nine diseases that will be presumptively associated with service in Southwest Asia. This amendment specifically includes Veterans with service in Afghanistan. However, no other parts of § 3.317 will include Veterans with service in Afghanistan. Therefore, while Veteran's [sic] of the current conflict in Iraq and other Southwest Asia locations qualify for disability compensation based on undiagnosed illnesses or medically unexplained chronic mulitsymptom illnesses, Veterans with service in Afghanistan do not.

Training Letter 10-01 (dated February 4, 2010, but amended in October 2010 without indication of the amendment); *see* App. Br. Exhibit B, pg. 3.

The Court holds that Training Letter 10-01, in its original form, is not a substantive rule and instead represents guidance from the VA Compensation and Pension Director to RO personnel, giving personnel notice of potential, forthcoming changes to the regulations. Significantly, the language of the letter, as originally drafted, clearly states that "a regulatory amendment to make this official is forthcoming." Training Letter 10-01 (February 4, 2010). Further, and equally as significant, the training letter also explains that "C&P Service is amending § 3.317 to clarify that chronic fatigue syndrome, irritable bowel syndrome, and fibromyalgia are not the only disability patterns that can be considered as 'medically unexplained chronic mulisymptom illnesses.'" *Id.; see* App. Br. Exhibit A, pg. 5. The letter, therefore, directs that "until the amended regulation becomes final, regional office personnel will be required to hold any claim where the medical evidence shows

a disability pattern that is not one of the three currently identified." *Id.* This language, taken together, clearly demonstrates that, like the situation in *Fournier*, the VA policy document at issue was meant to be a guidance directive for VA staff and was not meant to confer any rights upon veterans. *See Fournier*, 23 Vet.App. at 487. Further, as was the case in *Haas*, 525 F.3d at 1197, here VA's interpretation of the statute at issue, section 1117, was clear from its existing regulation, § 3.317, and therefore any discrepancy between Training Letter 10-01 and the agency's properly promulgated regulation "does not confer any rights" on a claimant.

## IV. CONCLUSION

Upon consideration of the foregoing, the May 20, 2014, Board decision is AFFIRMED.