# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 19-4633

RICHARD C. BAREFORD, APPELLANT,

V.

DENIS MCDONOUGH,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued January 14, 2021                                    Decided February 28, 2022)

*Jay Tymkovich*, with whom *Stephen B. Kinaird* was on the brief, both of Washington, D.C., for the appellant.

*Nathan P. Kirschner*, with whom *William A. Hudson, Jr.*, Principal Deputy General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Carolyn F. Washington*, Deputy Chief Counsel, all of Washington, D.C., were on the brief for the appellee.

Before BARTLEY, *Chief Judge*, and PIETSCH and FALVEY, *Judges*.

BARTLEY, *Chief Judge*, filed the opinion of the Court. FALVEY, *Judge*, filed an opinion concurring in part and dissenting in part.

BARTLEY, *Chief Judge*: Appellant Richard C. Bareford appeals through counsel a July 1, 2019, Board of Veterans' Appeals (Board) decision denying entitlement to a Government-furnished headstone or marker to memorialize veteran Roy H. Anderson, based on the Board's finding that Mr. Bareford was not a proper applicant for that benefit. Record (R.) at 3-6. This appeal is timely, and the Court has jurisdiction to review the Board decision pursuant to 38 U.S.C. §§ 7252(a) and 7266(a). This matter was referred to a panel of the Court to address Mr. Bareford's contention that VA impermissibly restricts, through regulation, who is authorized to apply for a Government-furnished headstone or marker on behalf of an eligible veteran, in excess of the authority conferred on VA by the enabling statute, 38 U.S.C. § 2306.[1] For the reasons stated

---

[1] When this matter was briefed and argued before the Court, VA's definitions of proper applicants for burial and memorial headstones and markers were codified at 38 C.F.R. § 38.600(a)(1) and (2) (2019). As of September 7, 2021, the definitions are codified at 38 C.F.R. § 38.630(c), for burial headstones and markers, and at § 38.631(c), for memorial headstones and markers. References to the regulations herein have been updated as appropriate to reflect the current codification.

below, the Court holds that there is a gap in section 2306 as to who may apply for Government-furnished headstones and markers, but that § 38.631(c) impose arbitrary and capricious restrictions on who is eligible to apply for memorial headstones and markers. Accordingly, the Court will set aside § 38.631(c), vacate the July 2019 Board decision, and remand the matter for additional development, if necessary, and readjudication consistent with this decision.

## I. FACTS[2]

On May 11, 1933, President Franklin Delano Roosevelt signed Executive Order 6129, directing that 25,000 World War I veterans be enrolled in a separate part of the Emergency Conservation Work (ECW) program. [3], [4] *Available at* http://www.fdrlibrary.marist.edu/_resources/images/eo/eo0002.pdf. Under the auspices of the Veterans Work Program, approximately 700 veterans were sent to the Florida Keys to build bridges to complete a highway between Key West and the mainland. *Florida Hurricane Disaster: Hearings on H.R. 9486 Before the H. Comm. on World War Veterans' Legislation* [hereinafter *Hearings*], 74th Cong. 6 (1935) (statement of Rep. J. Hardin Peterson, *available at* https://babel.hathitrust.org/cgi/pt?id=mdp.39015049888574&view=page&seq=10; *id*. at 33 (statement of Rep. J. Mark Wilcox; *id*. at 50-51 (statement of Julius F. Stone, Jr., Works Progress Admin.); *id*. at 110 (statement of Conrad Van Hyning, Adm'r, Fed. Emergency Relief Admin. (FERA)); *75 War Veterans in Gale Death List*, N.Y. TIMES, Sept. 4, 1935, at 4, *available at* https://timesmachine.nytimes.com/timesmachine/1935/09/04/93481926.html?pageNumber=4.

The project was intended to boost tourism and revitalize the economy in the Keys. Matthew G. Hyland, *The Florida Keys Hurricane House: Post-Disaster New Deal Housing*, 91 FLA. HIST. Q. 212, 221, *available at* www.jstor.org/stable/43487496 [hereinafter Hyland]. The

---

[2] In detailing the factual history of the 1935 hurricane and related events, which the parties do not dispute, the Court takes judicial notice of, and cites to, relevant government documents, contemporaneous news accounts, scholarly publications, and other sources of similar reputation. *See Tagupa v. McDonald*, 27 Vet.App. 95, 100 (2014) ("[T]he Court may take judicial notice of facts not subject to reasonable dispute if such facts are generally known or are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").

[3] The ECW program was a precursor to the Civilian Conservation Corps. *See* JOHN C. PAIGE, THE CIVILIAN CONSERVATION CORPS AND THE NATIONAL PARK SERVICE, 1933-1942: AN ADMINISTRATIVE HISTORY, ch. 1 (1995), *available at* https://www.nps.gov/parkhistory/online_books/ccc/ccc1b.htm (last accessed Oct. 5, 2021).

[4] All additional electronic sources were last accessed on October 5, 2021.

veterans assigned to the project were housed in three work camps on Lower Matecumba and Windley Keys that were managed by the Federal Emergency Relief Administration. *Id.*

On August 30, 1935, the Weather Bureau began publishing advisories about a tropical storm strengthening in the Bahamas. *Id.* at 222. By September 2, 1935, it looked as though the storm might affect the veteran work camps and FERA began to arrange for a rescue train to transport the veterans from the work camps to the mainland. *Id.* 222-23. However, through a series of misadventures, the train was delayed, and the veterans were not evacuated before the storm arrived. *Id.* at 223; Willie Drye, *The True Story of the Most Intense Hurricane You've Never Heard Of*, *available at* https://www.nationalgeographic.com/history/article/irma-most-intense-hurricane-florida-keys-1935-history; *Hurricane's Dead Dug Out of Debris*, N.Y. TIMES, Sept. 6, 1935, at 1, 8 (quoting a Weather Bureau official as saying that ample notice of danger was provided and a FERA administrator as contending that the weather reports did not indicate that evacuation was necessary), *available at* https://timesmachine.nytimes.com/timesmachine/1935/09/06/issue.html; *Storm Inquiry to Centre on Delay of Relief Train*, N.Y. TIMES, Sept. 6, 1935, at 11, *available at* https://timesmachine.nytimes.com/timesmachine/1935/09/06/93484269.html?pageNumber=11; *see also* Ernest Hemingway, *Who Murdered the Vets? A First-Hand Report on the Florida Hurricane*, THE NEW MASSES, Sept. 17, 1935, at 9 (questioning why the veterans were not evacuated before the storm), *available at* https://www.unz.com/print/NewMasses-1935sep17-00009/. When the rescue train finally arrived in the Keys, the passenger cars were blown off the track. Hyland at 224; Ian Shapira, "*Deaths Laid to Act of God*": *The Devastating 1935 Hurricane that Surprised the Florida Keys*, WASH. POST, Sept. 7, 2017, *available at* https://www.washingtonpost.com/news/retropolis/wp/2017/09/07/deaths-laid-to-act-of-god-the-devastating-1935-hurricane-that-surprised-the-florida-keys/.

The unnamed hurricane, one of only three Category 5 Atlantic hurricanes to make landfall in the United States in nearly nine decades, *see* Maggie Astor, *No, Hurricane Irma Won't Be a "Category 6" Storm*, N.Y. TIMES, Sept. 6, 2017, at A14, *available at* https://www.nytimes.com/2017/09/06/us/hurricane-irma-category-six.html, killed over 250 veterans from the work camps, *Hearings*, 74th Cong. 332 (1935) (statement of Conrad Van Hyning, Admin'r, FERA), *available at* https://babel.hathitrust.org/cgi/pt?id=mdp.39015049888574&view=page&seq= 338&skin=2021.

President Roosevelt ordered that the veterans' bodies be transported "where the next of kin desired and indicated military funerals and burial in Arlington National Cemetery at Washington for some." *Hurricane's Dead Dug Out of Debris*, N.Y. TIMES, Sept. 6, 1935, at 8, *available at* https://timesmachine.nytimes.com/timesmachine/1935/09/06/issue.html; *see also 3 Inquiries Start in Florida Deaths*, N.Y. TIMES, Sept. 7, 1935, at 3, *available at* https://timesmachine.nytimes.com/timesmachine/1935/09/07/issue.html (reporting that a Veterans Bureau representative stated that public funeral services, with full military honors, would be held for the deceased veterans and their bodies buried where directed by family members). Eighty veterans whose bodies were recovered in the first few days after the hurricane were buried with full military honors on September 7, 1935, in Woodlawn Cemetery, Miami, Florida. *Hearings*, 74th Cong. 332 (1935) (statement of Conrad Van Hyning, Admin'r, FERA), *available at* https://babel. hathitrust.org/cgi/pt?id=mdp.39015049888574&view=page&seq=338&skin=2021.

But on September 6, 1935, Florida's Governor, David Sholtz, ordered that the remaining bodies be cremated because of public health concerns. *See Hearings*, 74th Cong. 262-63 (1935) (statement of Dr. J.T. Googe, Fla. Health Dep't), *available at* https://babel.hathitrust.org/cgi/pt?id=mdp.39015049888574&view=page&seq=268&skin=2021; *3 Inquiries Start in Florida Deaths*, N.Y. TIMES, Sept. 7, 1935, at 3, *available at* https://timesmachine.nytimes.com/timesmachine/1935/09/07/issue.html; *Cremations Begun in Key Gale Area*, N.Y. TIMES, Sept. 8, 1935, at 37, *available at* https://timesmachine.nytimes.com/timesmachine/1935/09/08/93704680.html?pageNumber=37. At least 168 veterans' bodies were cremated in the Keys. *Hearings*, 74th Cong. 332 (1935) (statement of Conrad Van Hyning, Admin'r, FERA), *available at* https://babel.hathitrust.org/cgi/pt?id=mdp.39015049888574&view=page&seq=338 &skin=2021. Veteran and civilian dead were cremated together, and individual remains could not be separated. *See Hearings*, 74th Cong. 386 (1935) (statement of George E. Ijams, Assistant Admin'r, Veterans' Affairs), *available at* https://babel.hathitrust.org/cgi/pt?id=mdp.39015049888574&view=page&seq=385&skin=2021. Two years later, the commingled remains were interred in an Islamorada, Florida, memorial to all victims of the 1935 hurricane; the interred veterans are not individually memorialized. *See* R. at 62; *see also* U.S. DEP'T OF THE INTERIOR, NAT'L PARK SERV., NAT'L REGISTER OF HISTORIC

PLACES, *Florida Keys Memorial*, *available at* https://npgallery.nps.gov/pdfhost/docs/nrhp/text/95000238.PDF.

Roy H. Anderson was one of the veterans killed in the 1935 hurricane. He served honorably in the U.S. Army from April 1918 to March 1919. R. at 80. His wife died in 1930 and they had no children. R. at 63. He was assigned to one of the work camps on Lower Matecumbe Key. *Id*. His body was located on October 10, 1936, and his cremated remains were commingled with other veterans and civilians and interred in the Florida Keys Memorial in Islamorada. *Id*. No other marker or memorial has been provided on his behalf. *Id*.

In August 2017, Mr. Bareford requested that VA provide a Government-furnished headstone or marker to memorialize Mr. Anderson. R. at 79. The application was co-signed by a representative of the South Florida National Cemetery in Lake Worth, Florida, the cemetery that agreed to accept delivery of the headstone or marker. *Id.* In September 2017, the VA National Cemetery Administration (NCA) denied the request, explaining that Mr. Bareford was not a recognized applicant under 38 C.F.R. §§ 38.630 and 38.631. R. at 77-78. Mr. Bareford filed his Notice of Disagreement the following month. R. at 56-64. He asserted that §§ 38.630 and 38.631 are inconsistent with their enabling statute, 38 U.S.C. § 2306, because the statute "places no restrictions whatsoever on who may apply for the benefit." R. at 57. He emphasized that the veterans whose remains are interred in the memorial crypt in Islamorada are not individually memorialized, either there or elsewhere. R. at 62.

The NCA issued a Statement of the Case in November 2017, again finding that Mr. Bareford was not an authorized applicant. R. at 52-54. Mr. Bareford filed his Substantive Appeal the same month. R. at 18-49. He noted that the director of Woodlawn Cemetery in Miami had been permitted to apply for grave markers for the veterans whose bodies were recovered before Governor Sholtz's cremation order and buried in unmarked graves in that location. R. at 41. He further explained that he had requested that VA place a group memorial at the Islamorada memorial for those interred within, but that his request was denied because VA indicated that it can only place group memorials in national cemeteries. R. at 41. He stated that he had requested that the Islamorada Village Council approve a veterans memorialization at the monument, but that the Council declined to alter the monument to identify the individual veterans interred within. R. at 44. He reported that he was able to locate family members to request memorials at the South

Florida National Cemetery for two veterans, which VA approved, but that the other veterans killed in the 1935 hurricane and interred in the Islamorada memorial remain unmemorialized. R. at 45.

In the July 2019 Board decision on appeal, the Board found that it was bound as a matter of law by the applicant limitations outlined in 38 C.F.R. § 38.600(a)(1)-(2) (2019) (now 38 C.F.R. §§ 38.630(c) and 38.631(c)). R. at 4-6. To clarify, though the Board cited § 38.600(a)(1) (2019), which concerns the definition of an applicant for a burial headstone and marker, the Board found: "It is uncontroverted that the appellant is not a family member of the Veteran." R. at 4-5. Thus, the Board made a finding that Mr. Bareford was not a proper applicant for a memorial headstone or marker in accordance with the terms of § 38.600(a)(2) and implicitly denied him eligibility as an applicant under that subsection. *See generally* 38 U.S.C. § 7104(a); *Stern v. McDonough*, 34 Vet.App. 51, 59 (2021) (citing *Faust v. W.*, 13 Vet.App. 342, 353-56 (2000) (discussing when the Board makes a finding in accordance with the terms of a regulation and how the Board's failure to explicitly cite and discuss that regulation in its analysis is harmless when the "evidence overwhelming shows" that entitlement to the benefit sought is precluded under that regulation)).

Because it found that Mr. Bareford does not meet the regulatory definition of a proper applicant for a Government-furnished headstone or maker to memorialize Mr. Anderson, *see* R. at 5, the Board denied the claim, R. at 3. This appeal followed.

## II. ANALYSIS

Congress has directed that "[t]he Secretary shall furnish, when requested," burial headstones or markers for the unmarked graves of eligible individuals or, when the remains are unavailable, "an appropriate memorial headstone or marker for the purpose of commemorating an eligible individual." 38 U.S.C. § 2306(a), (b).[5] VA has promulgated regulations restricting who is authorized to request burial and memorial headstones and markers. For veterans whose remains are identified and available, VA will provide a burial headstone or marker and applicants must be either a family member; a personal representative (as defined in 38 C.F.R. § 3.600); a representative of a congressionally chartered veterans service organization (VSO); a government employee whose responsibilities include providing services to veterans and their families; anyone legally responsible for the disposition of the veteran's remains or related matters; or, in the case of

---

[5] The parties do not dispute that the veteran, Mr. Anderson, was an eligible individual as defined in section 2306.

6

veterans whose service ended before April 6, 1917, any individual. 38 C.F.R. § 38.630(c) (2021). For veterans whose remains are unavailable or unidentified, VA will provide a memorial headstone or marker, but only family members may apply. 38 C.F.R. § 38.631(c) (2021).

### A. The Arguments

The parties agree that statutory subsections 2306(a) and (b) do not identify who is authorized to request a burial or memorial headstone or marker, but they disagree as to what the absence of explicit identification of who may request the same means.

Mr. Bareford argues that the plain language of the statute reflects Congress's unambiguous intent that anyone may request a burial or memorial headstone or marker on behalf of a deceased veteran; therefore, by imposing limits as to who may make such requests, §§ 38.630(c) and 38.631(c) conflict with statutory subsections (a) and (b). Appellant's Brief (Br.) at 15. In other words, he contends that Congress said nothing on the matter because there is nothing to be said. He asserts that statutory subsections (a) and (b) unambiguously provide that "'[t]he Secretary shall furnish, when requested,' appropriate Government headstones or markers." *Id*. at 18. He characterizes the statutory language as "mandatory" and therefore argues that there is "no gap to be filled by agency regulation." *Id*. He observes that another portion of the statute, subsection (e), clearly states that certain benefits for burial receptacles are only available to a veteran's survivors, indicating that "Congress knew how to restrict the applicant pool . . . when that was its intent." *Id*. at 20. Therefore, because statutory subsections (a) and (b) place no restriction on who may request a Government headstone or marker, he contends that "[n]o reasonable construction of the statute permits the Secretary to deny requests" for headstones or markers on the basis of the requestor's identity and urges the Court to invalidate VA's attempt to limit applicant eligibility as codified in §§ 38.630(c) and 38.631(c). *Id*. at 22.

In the alternative, Mr. Bareford asserts that §§ 38.630(c) and 38.631(c) are arbitrary and capricious. With respect to § 38.630(c), he asserts that VA changed, without explanation, its previous policy "from 1973 to 2009 that anyone with knowledge of the deceased veteran could apply for headstones and markers." *Id*. at 23. He contends that the regulation "conflicts with congressional intent by making it impossible to mark the graves of veterans who lack an identifiable and cooperative family member." *Id*. at 27. As for § 38.631(c), he asserts that it "is even more indefensible" because "VA had no cause to impose dramatically more stringent restrictions upon applicants for memorial headstones and markers than upon applicants for burial

headstones and markers." *Id*. at 27. He disputes VA's contention that the purpose of memorial headstones and markers is "solely to provide the family a place to mourn the dead," *id*., arguing that "[n]othing in section 2306 remotely implies" that memorialization is solely for the benefit of family, *id*. at 28. To ensure "the primacy of family wishes," Mr. Bareford suggests that VA promulgate rules governing the priority of applicants. *Id*. at 30; *see* Reply Br. at 13.

As for Mr. Bareford's statutory interpretation argument, the Secretary responds that "[s]ection 2306 is silent as to *who* may be an applicant, and therefore leaves a gap for the Secretary to fill." Secretary's Br. at 6. The Secretary notes that a 1948 congressional act delegated the responsibility and authority for providing Government-furnished headstones and markers for unmarked graves to the Secretary of the Army, *id*. at 9, and that a 1958 amendment to that act further specified that the Secretary of the Army was "authorized to prescribe such rules and regulations with respect to the submission of applications for all Government headstones and markers" requested under the provisions of that act, *id*. at 10 (quoting Act of Aug. 14, 1958, Pub. L. No. 85-644, 75 Stat. 601, 602) (emphasis omitted). The Secretary contends that the language of the 1958 amendment indicates that Congress delegated to the Army authority "to establish who's a proper applicant." *Id*. at 12. The Secretary argues that in 1958, when Congress first gave the Secretary of the Army the authority to prescribe regulations relating to headstones and markers, the congressional "intent was clearly to give the families of deceased veterans a place to honor their loved ones." *Id*. at 18-19.

The Secretary further asserts that, when Congress transferred authority over national cemeteries and memorials to VA through the National Cemeteries Act of 1973, its failure to explicitly identify proper applicants when it had the opportunity to do so implicitly or explicitly delegated responsibility for that decision to VA. *Id*. Thus, the Secretary asserts, "section 2306's silence as to 'who' may be a proper applicant left a gap for the Secretary to fill by regulation." *Id*.

As to Mr. Bareford's regulatory interpretation argument, the Secretary asserts that neither § 38.630(c) nor § 38.631(c) is arbitrary and capricious. *Id*. at 12-21. He argues that the regulations "represent[] a reasoned, and reasonable, line-drawing by VA." *Id*. at 19. The Secretary contends that the regulations cannot be considered arbitrary because "VA considered [Mr. Bareford's] specific comments during the notice and comment period prior to publishing the final version," and that any "particular policy choices in crafting the regulation [are in] its purview." *Id*. at 21.

8

Therefore, the Secretary argues, the Court should defer to VA's interpretation of section 2306. *Id.* at 12-13.

### B. *Chevron* Step One

When the Court interprets a statute, it looks to the statute's text and structure, as well as its legislative history. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-46 (1984); *Myore v. Nicholson*, 489 F.3d 1207, 1211 (Fed. Cir. 2007) (quoting *McEntee v. M.S.P.B.*, 404 F.3d 1320, 1328 (Fed. Cir. 2005) (noting that statutory interpretation "'begins with the language of the statute, the plain meaning of which we derive from its text and its structure'"). This analysis is colloquially known as *Chevron* step one.

When "the statutory language is unambiguous and 'the statutory scheme is coherent and consistent,'" the Court's statutory inquiry ends, *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240 (1989)), and "the [C]ourt, as well as the agency, must give effect to the unambiguously expressed intent of Congress," *Chevron*, 467 U.S. at 842-43. In other words, when the statute is unambiguous, the Court need not proceed to step two in the *Chevron* analysis framework and, instead, "must enforce [the statute] according to its terms." *King v. Burwell*, 576 U.S. 473, 486 (2015); *see also Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) (holding that when the first *Chevron* step "yields a clear answer, judges must stop").

"It is only after finding a statutory ambiguity that courts may consider the possibility that Congress delegated to an agency the power to fill a gap." *Buffington v. McDonough*, 7 F.4th 1361, 1368 (Fed. Cir. 2021) (O'Malley, J., dissenting) (citing *United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 488 (2012)). "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Chevron*, 467 U.S. at 843-44; *see Morton v. Ruiz*, 415 U.S. 199, 231 (1974) ("The power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress."). Thus, when Congress leaves a gap in the statute, Congress delegates authority to the Agency to fill that gap, for example by authorizing the Agency to implement regulations pursuant to a formal administrative procedure called notice-and-comment. *See United States v. Mead Corp.*, 533 U.S. 218, 229-31 (2001); *Chevron*, 467 U.S. at 843-44. Under 38 U.S.C. § 501(a), Congress delegated to the Secretary the "authority to prescribe all rules and regulations

9

which are necessary or appropriate to carry out the laws administered by the Department and are consistent with those laws."

With above framework in mind, the Court must first determine whether the statutory language is silent or ambiguous as to the matter at issue. *Chevron*, 467 U.S. at 842-43. Whether a statute is unambiguous or a gap exists for the agency to fill is a question of law that the Court reviews de novo. *See Lane v. Principi*, 339 F.3d 1331, 1339 (Fed. Cir. 2003) ("[I]nterpretation of a statute or regulation is a question of law. . . .").

### 1. *Guidance for Determining Whether There is a Gap*

The first question in this case is whether the absence of an explicit indication as to who may request a Government-furnished burial or memorial headstone or marker on behalf of a veteran reflects either an unambiguous congressional intent that anyone may make a request or a gap in the statute that Congress delegated to VA the authority to fill. To answer that question, it is constructive to consider why courts have found, with respect to other statutes, that Congress left a gap for the agency to fill and compare those statutes to section 2306.

In some cases, Congress used, but did not define, a critical statutory term, thus delegating to the agency the authority to supply a definition. For example, in *Cox v. McDonald*, this Court held that 38 U.S.C. § 1117 is ambiguous because it directed the Secretary to take certain actions with respect to "the Southwest Asia theater of operations," but neither defined that term nor explicitly directed the Secretary to provide a definition. 28 Vet.App. 318, 323 (2016). And in *Breniser v. Shinseki*, the Court held that 38 U.S.C. § 1114(o) was ambiguous because it uses, but does not define, the terms "condition" and "conditions"; therefore, Congress delegated to the Secretary the authority to provide those definitions. 25 Vet.App. 64, 72 (2011). Similarly, in *Heino v. Shinseki*, the Court held that, because 38 U.S.C. § 1722A(a)(2) does not define the term "cost to the Secretary," it is silent or ambiguous as to how that term should be defined. 24 Vet.App. 367, 373 (2011).

In other cases, Congress expressly addressed part, but not all, of a particular process, either explicitly or implicitly delegating to the agency the authority to regulate the remainder of that process. For example, in 38 U.S.C. § 5112(b), Congress specified the effective date for the discontinuance of disability benefits for veterans who are receiving active duty pay. But Congress was silent as to the date benefits should recommence, thereby leaving a gap for the agency to fill. *Buffington v. Wilkie*, 31 Vet.App. 293, 301 (2019), *aff'd sub. nom. Buffington v. McDonough*,

10

7 F.4th 1361 (Fed. Cir. 2021). Similarly, in 28 U.S.C. § 2412(d)(a)(B), Congress explicitly imposed a deadline by which prevailing parties must file an Equal Access to Justice Act application for attorney fees and expenses. But Congress said nothing about the time allowed for agency response; consequently, it left a gap. *Coley v. Wilkie*, 32 Vet.App. 284, 288 (2020). In 38 U.S.C. § 5904, Congress expressly delegated to the Secretary the authority to specify the manner in which attorneys file fee agreements with VA. *Ravin v. Wilkie*, 30 Vet.App. 310, 316 (2018), *aff'd*, 956 F.3d 1346 (Fed. Cir. 2020). In *Lynch v. Wilkie*, the Court held that 38 U.S.C. § 1313 provides for VA death benefits to be paid to eligible children, but left a gap because it was "silent as to *when* to evaluate whether a claimant is a 'child.'" 30 Vet.App. 296, 302 (2018). And in *Jernigan v. Shinseki*, the Court held that Congress's explicit delegation to the Secretary of the authority to prescribe claim forms reasonably encompassed the authority to prescribe the claim form submission process, including creating a time limit for filing formal claims. 25 Vet.App. 220, 225-26 (2012).

What the above cases have in common is that additional agency guidance was required because the statute included a gap; a statute cannot be applied accurately and consistently when its operative terms are not defined or its processes are only partially described.

*2. Section 2306 Leaves a Gap*

"[I]n a *Chevron* step-one analysis, we employ traditional tools of statutory construction and examine 'the statute's text, structure, and legislative history, and apply the relevant canons of interpretation.'" *Heino v. Shinseki*, 683 F.3d 1372, 1378 (Fed. Cir. 2012) (*quoting Delverde, SrL v. United States*, 202 F.3d 1360, 1363 (Fed. Cir. 2000). In other words, when considering whether section 2306 is ambiguous, the Court cannot consider subsections (a) and (b), in their current form, in isolation from the rest of the statute or its history. *See Chevron*, 467 U.S. at 843-46; *Myore*, 489 F.3d at 1211; *Gardner v. Derwinski*, 1 Vet.App. at 584, 586 (1991).

Subsection 2306(b)(1) provides: "The Secretary shall furnish, when requested, an appropriate memorial headstone or marker for the purpose of commemorating an eligible individual whose remains are unavailable." Subsection (c) discusses the material out of which headstones and markers may be made when "furnished under subsection (a), (b), or (d) of this section" and references how such a headstone or marker can be "requested by the person entitled to request such headstone or marker." Subsection (c) does not explicitly state who is "the person entitled to request such headstone or marker" furnished under subsection (a) or (b).

11

Mr. Bareford argues that any restriction on applicant entitlement in subsection (c) refers solely to applicants under subsection (d), concerning requests for burial headstones or markers for veterans buried in private cemeteries, because subsection (d) contains an explicit restriction that the applicant "certif[y] to the Secretary that the headstone or marker will be placed" on the grave or "as close as possible to the grave"; therefore, he argues, the phrase "person entitled to request" does not relate to or restrict applicants under subsections (a) and (b). OA at 59:18-1:00:06, *Bareford v. McDonough*, U.S. Vet. App. No. 19-4633 (oral argument held January 14, 2021); *see also Russello v. United States*, 464 U.S. 16, 23 (1983) ("'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir.1972)).

The Secretary argues that the phrase "person entitled to request" applies to subsections (a), (b), and (d); that this language leaves a gap because, in describing some persons as "entitled" to request a headstone or marker, Congress necessarily indicated that some individuals would be excluded from that entitlement; that the undefined term in this instance is "the person entitled to request such headstone or marker"; and that this gap represents a delegation to the Secretary of the authority to restrict applicants under subsections (a) and (b). OA at 24:59-25:13.

To answer this question of whom the phrase "persons entitled to request" refers to, the Court turns to the history of section 2306. The Secretary emphasizes that when Congress delegated to the Secretary of the Army the authority to prescribe regulations relating to headstones and markers, the congressional "intent was clearly to give the families of deceased veterans a place to honor their loved ones." Sec. Br. at 18-19. But the National Cemeteries Act of 1973 (1973 Act) transferred responsibility for the National Cemetery System from the Department of the Army to what was then called the Veterans Administration. Pub. L. No. 93-43, § 1000, 87 Stat. 75 (June 18, 1973). The 1973 Act added to Title 38 a new section 906, Headstones and Markers, which stated that the VA Administrator "shall furnish, when requested," burial and memorial headstones and markers, and set no restrictions as to who was eligible to make such requests. *Id*. at 80 (setting forth § 906(a) (for burial headstones or markers) and (b) (for memorial headstones or markers).

In October 1978, Congress revised section 906 to add subsection (c), specifying that "a headstone or marker furnished under subsection (a) or (b)" may be fabricated out of certain enumerated materials when "requested by the person entitled to request such headstone or marker."

12

Veterans' Housing Benefits Act of 1978, Pub. L. No. 95-476, 92 Stat. 1497, 1505 (Oct. 18, 1978). If some persons are entitled to request headstones or markers furnished under subsections (a) and (b), it inevitably follows that some are not; otherwise, the phrase "entitled to request" would be rendered superfluous. *See Splane v. West*, 216 F.3d 1058, 1068-69 (Fed. Cir. 2000) ("[C]anons of construction . . . require us to give effect to the clear language of a statute and avoid rendering any portions meaningless or superfluous."). Accordingly, the language of this revision, read in the context of the statute as a whole, makes clear that Congress intended, when revising the statute in 1978, that some persons are entitled to request Government-furnished headstones and markers and some are not.

The statute, today codified at § 2306(c), has been revised such that subsection (c) also applies to an additional subsection (d) and reflects the elevation of VA to an executive department. But nothing about these revisions suggests a change from the statutory amendments set forth in 1978: that a request for a Government-furnished headstone or marker under subsection (a) or (b) must be made "by the person entitled to request such headstone or marker." However, Congress has never defined the phrase "person entitled to request such headstone or marker." Because Congress was silent as to who is entitled to request headstones or markers, it left a gap for the agency to fill. *See Chevron*, 467 U.S. at 843-44; *see also Buffington*, 31 Vet.App. at 301; *Cox*, 28 Vet.App. at 323.

Accordingly, and in light of VA's gap-filling regulations implemented after notice-and-comment, the Court turns now to step two of the *Chevron* analysis: whether the Agency's answer for the gap is a reasonable one to which the Court must defer or whether the Agency's gap-filling regulations are arbitrary, capricious, or manifestly contrary to the statute. *See Chevron,* 467 U.S. at 844.

### C. *Chevron* Step Two

Once it is determined that the statute in question is ambiguous and leaves a gap for the agency to fill, under step two of *Chevron* the analysis turns to whether the agency's interpretation of the statute, as reflected in the corresponding implementing regulations, is permissible. *Id..* at 843. Courts will defer to an agency's "reasonable interpretation" of a statute. *Id.* at 844-45; *see also Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 58 (2011). If an agency's choice of policy "'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, [the courts] should not disturb it unless it

13

appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.'" *Chevron*, 467 U.S. at 845 (quoting *United States v. Shimer*, 367 U.S. 374, 382, 383 (1961)). However, the Court will hold unlawful and set aside regulations issued or adopted by the Secretary when they are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law"; such regulations receive no *Chevron* deference. 38 U.S.C. § 7261(a)(3); *see Mead Corp.*, 533 U.S. at 227; *Chevron*, 467 U.S. at 844; *see also Mayo Found.*, 56 U.S. at 53.

"'The scope of the Court's review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.'" *Evans v. McDonald*, 27 Vet.App. 180, 189 (2014) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983)), *aff'd*, 642 F. App'x 982 (Fed. Cir. 2016). But, under this standard, an agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Here, the Court must determine whether the Agency

> has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* And "[t]he reviewing court should not attempt itself to make up for such deficiencies; [it] 'may not supply a reasoned basis for the agency's action that the agency itself has not given'." *Id.* (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Furthermore, when an agency changes existing policies, the agency must show "that there are good reasons for the new policy" and must provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)); *see also Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 981 (2005) (holding that agencies must "adequately explain[] the reasons for a reversal of policy").

### 1. § 38.631(c) Is at Issue

Mr. Bareford asserts that §§ 38.630(c) and 38.631(c) are both arbitrary and capricious. Because the difference between the two is whether a veteran's remains are available for burial,

they cannot both apply to Mr. Bareford's claim. Thus, as a preliminary matter, the Court must clarify whether Mr. Bareford seeks a burial headstone or marker for Mr. Anderson under 38 C.F.R. § 38.630 or a memorial headstone or marker under § 38.631.

In his initial August 2017 application, Mr. Bareford was clear that Mr. Anderson's remains were cremated and comingled with others' remains, rather than buried, and that his remains are not available for burial. R. at 79. In his October 2017 NOD, he asserted that VA's regulation regarding memorial headstones and markers is arbitrary and capricious, R. at 56, arguing that there is no reason to distinguish between eligible applicants for burial and memorial headstones and markers, *see* R. at 59-60. In his November 2017 Substantive Appeal, he challenged VA's denial of entitlement "to a memorial marker because the applicant is not a relative" and asserted that the pertinent regulation is arbitrary and capricious. R. at 18. In his initial brief, Mr. Bareford contends specifically that it is arbitrary and capricious to limit applicants for memorial headstones or markers to family members. Appellant's Br. at 27. And at oral argument, he reiterated that he was seeking a memorial marker, which only families may request under the current version of § 36.631(c). OA at 58:29-:49.

Accordingly, the Court concludes that the issue presented is whether 38 C.F.R. § 38.631(c), which limits eligible memorial headstone or marker applicants to family of the veteran, is arbitrary and capricious.

### 2. VA's Policy Explanations

Before 2005, the application process for requesting a VA-provided headstone or marker was codified at 38 C.F.R. § 1.632, which stated simply that a form was required. In 2005, VA relocated regulations pertaining to the NCA from Part 1 of Title 38 to Part 38. Relocation of National Cemetery Administration Regulations, 70 Fed. Reg. 4768-01 (Jan. 31, 2005). As part of that revision, the headstone or marker application process was relocated to 38 C.F.R. § 38.632; the application process remained substantively the same, with submission of a VA form the only requirement for ordering Government burial or memorial headstones or markers. *Id*. at 4773.

In January 2007, VA proposed a substantial revision to § 38.632 "to update ordering procedures for headstones and markers" and to address requests for emblems of belief. Headstone and Marker Application Process, 72 Fed. Reg. 2480-01 (Jan. 19, 2007). VA noted: "Congress has authorized VA to promulgate all necessary rules and regulations to ensure that these cemeteries are maintained as 'national shrines as a tribute to our gallant dead' and that graves are appropriately

marked." *Id.* at 2480. In the proposed rule, VA, for the first time, defined an applicant as "refer[ing] to the next of kin or personal representative of the deceased eligible individual who applies for a Government-furnished headstone or marker." *Id.* at 2483. VA explained why it was revising the process for requesting emblems of belief but did not explain why it was proposing a new, limiting definition of "applicant" for the purpose of requesting burial or memorial headstones or markers. *See id.*

The corresponding final rule was effective June 1, 2009. In the final rule, "applicant" was defined as "the decedent's next-of-kin (NOK), a person authorized in writing by the NOK, or a personal representative authorized in writing by the decedent." 38 C.F.R. § 38.632(b)(1) (2009). In the comments to the final rule, VA stated that "[G]overnment-furnished headstones and markers serve a particular, congressionally mandated purpose, namely, to commemorate the gallant dead in a manner commensurate with the dignity of their sacrifice." Headstone and Marker Application Process, 74 Fed. Reg. 26,092-01, 26,094 (Jun. 1, 2009) (citing 38 U.S.C. § 2403(c) for the proposition that "cemeteries under VA control shall be considered 'shrines as a tribute to our gallant dead'"). But VA did not address its novel limitation on eligible applicants for Government-furnished headstones or markers.

In 2014, VA "propose[d] to amend its regulations defining who may apply for a headstone or marker," explaining that the "intended effect of this proposed rule would be to expand the types of individuals who may request headstones and markers on behalf of decedents." Applicants for VA Memorialization Benefits, 79 Fed. Reg. 59,176-01 (Oct. 1, 2014). VA acknowledged "concerns that the existing applicant definition is too restrictive and results in identified veteran gravesites going unmarked." *Id.* VA explained:

> Because of the regulatory restriction, VA denied the requests for headstones or markers which has frustrated the efforts of individuals to ensure the unmarked graves of veterans, particularly those from historic eras, are appropriately marked. VA shares the goal of these individuals to ensure appropriate recognition of veterans who served the United States and proposes to revise the definition of applicant to ease the restrictive aspects of the definition and allow more individuals to apply for headstones and markers, including memorial headstones and markers.

*Id.* at 59,176-77.

And, for the first time, VA proposed different eligibility requirements for applicants for burial headstones and markers than for applicants for memorial headstones and markers. *Id.* at 59,176-78. As a preliminary matter, VA explained: "The revised definition of applicant recognizes

that VA is authorized to provide two types of headstones or markers." *Id.* at 59,177 (citing subsections 2306(a) and (b) to show there are two types of headstones and markers).

For burial headstones and markers, it proposed that, for veterans whose service ended on or after April 6, 2017, eligible applicants would include, in addition to family members, personal representatives, representatives of congressionally chartered veterans service organizations, and individuals responsible under applicable laws for the disposition of unclaimed remains or other interment or memorialization matters. *Id.* For veterans whose service ended before April 6, 1917, VA proposed no restrictions on applicant eligibility for burial markers or headstones. *Id.* at 59,177-78. Regarding these definitions of "applicant," VA explained, among other things:

> Use of the revised definition of personal representative would allow for application for headstones and markers not only by family members, but also by individuals who have no familial relationship to the veteran but to whom the responsibility for final disposition of the remains or other related activities have [sic] fallen. For example, a close friend or a fellow veteran who served with the decedent may be called upon to make final arrangements for a veteran with no living family members. We want to make it possible for this individual to request memorialization of the veteran.
> . . .
> We chose to use April 6, 1917, because it is the date on which the United States entered World War I. We are aware that many individuals are interested in researching genealogy, either for themselves or others, or have broad interest in researching military history, including the burial of veterans. We know that many individuals have taken up the task of identifying burial places of veterans to obtain for them a lasting memorial to their service. We applaud the efforts of these individuals and seek to recognize those efforts by allowing them to make an application if they identify an unmarked grave of an eligible individual. We believe that if the grave belongs to a veteran who served during World War I or later, it is more likely that a living family member (as defined in proposed paragraph (a)(1)) could be found. To ensure that family wishes are respected, we believe that an unrelated individual who identifies an unmarked grave of an eligible veteran who served during or after World War I should attempt to identify and contact family rather than making the application for a burial headstone or marker directly to VA.

*Id.*

On the other hand, VA proposed that for memorial headstones and markers, it would permit applications from "family members" only, which it characterized as a broader category than "next of kin." *Id.* at 59,177 (explaining that for both burial and memorial headstones and markers, "the phrase 'next of kin,' is too restrictive because it would not allow for extended relatives, such as fifth cousins and great-nieces or great-great-nephews, to request a headstone or marker for their

17

relatives"). In proposing these revisions, VA stated: "Memorial headstones and markers, under section 2306(b), are distinct from burial headstones and markers and are authorized to commemorate an eligible individual whose remains are unavailable for burial." *Id.* at 59,178. VA further stated that a memorial site, like a gravesite, provides a physical place for family to gather and remember their loved one "and of the contribution of a veteran to our country." *Id.* VA then explained:

> We are proposing to limit the definition of applicant for memorial headstones and markers to family members . . . so that a memorial headstone or marker retains the same symbolism and purpose that a burial headstone would have. It is a commemoration of an individual, not the service of the individual. The nation honors the service of veterans in many ways; the memorial headstone or marker allows families to honor their loved one individually.

*Id.* But at oral argument, the Secretary conceded that it is the veteran, not the family member, who is entitled to a headstone or marker, OA at 38:01-:15, and that the statutory purpose in providing headstones and markers includes recognizing a veteran's service to country, OA at 25:50-29:02.

The final rule, effective April 1, 2016, adopted the proposed definitions for applicant, with the addition of permitting burial headstone and marker applications from state and local individuals who serve veterans and their families in an official capacity. 38 C.F.R. 38.600(a) (2016). When addressing the public's supportive comments for the proposed expanded definitions of applicant for both burial and memorial headstones and markers, VA noted that its "intent is that the expanded applicant definition will encourage more people to present memorialization claims." Applicants for VA Memorialization Benefits, 81 Fed. Reg. 10,765-01, 10,766 (Mar. 2, 2016).

VA acknowledged: "While it is true that there was no definition of applicant [for both types of headstones or markers] in our regulations [before 2009], VA's policy was to accept memorialization requests from VSOs, landowners, and anyone with knowledge of the decedent." *Id.* at 10,767. VA disagreed with the public's comments suggesting the elimination of any definition of applicant for both types of headstones and markers, explaining: "[O]ur intent, as much as possible, is to reserve to the family of the decedent decisions regarding memorialization. This includes the decision not to obtain a government-furnished headstone or marker—or any marker at all, if that is their decision." *Id.* at 10,768. And specifically regarding the definitions of the various applicant classes for burial headstones and markers, VA stated: "We believe our approach

strikes an appropriate balance between protecting the interests of a decedent's family and ensuring the appropriate memorialization of veterans." *Id.* at 10,769.

VA further acknowledged that commenters had objected to the proposed definition of applicants for memorial headstones and markers. *Id*. at 10,768-70. VA characterized memorial headstones and markers as serving a purpose "similar to that provided by a burial headstone or marker when remains are available for burial," and stated that, like burial headstones and markers, a memorial headstone or marker "provide[s] a family with a physical site to gather to mourn and remember their loved one." *Id*. at 10,769. VA then explained: "As such, VA has determined that requests for memorial headstones and markers should be made by family members who are likely to want to memorialize someone whose life had specific meaning to them." *Id*.

As the above demonstrates, before April 2016 VA's policy was to define applicants for the two types of headstones and markers the same. But since April 2016, VA's policy has been to define applicants for the two types of headstones and markers differently, with a much more restrictive definition for applicants for memorial headstones and markers as compared to applicants for burial headstones and markers.

The Court will now explain why it will not afford deference to VA's construction of who is eligible to apply for a memorial headstone or marker under section 2306. *See Chevron,* 467 U.S. at 844.

### 3. § 38.601(c) Is Arbitrary and Capricious

VA has failed to articulate a satisfactory explanation for its 2016 policy of restricting the applicant class for memorial headstones and markers to just family members, to include "a rational connection between the facts found and the choice made" and "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy"; and, ultimately, VA's policy fails to reconcile conflicting policies and fails to represent a reasonable accommodation of conflicting policies that Congress would have sanctioned. *See Encino Motorcars*, 579 U.S. at 222; *Chevron*, 467 U.S. at 844-45; *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Regarding the facts and circumstances underlying VA's policies concerning *both* types of headstones and markers, VA has acknowledged that "government-furnished headstones and markers serve a particular, congressionally mandated purpose, namely, to commemorate the gallant dead in a manner commensurate with the dignity of their sacrifice." Headstone and Marker

19

Application Process, 74 Fed. Reg. 26,092-01, 26,094 (Jun. 1, 2009). And VA characterized memorial headstones and markers as serving a purpose that is the "same" or "similar" to the purpose of burial headstones and markers. Specifically, VA explained that both types of headstones and markers provide a physical site for the family of the decedent to mourn and honor their loved one.

And regarding VA's prior policies concerning who is eligible to apply for *both* types of headstones and markers, VA explained that its policy before 2009 was to accept memorialization requests from VSOs, landowners, and anyone with knowledge of the decedent. And, in promulgating its current policies, VA acknowledged that its 2009 policy of restricting eligible applicants to next-of-kin contravenes VA's own stated goal of ensuring that veterans, particularly those from historical eras, are recognized for their service to our country. In sum, VA's policy before 2016 had always been to define the applicants for both burial and memorial headstones and markers the same, which makes perfect sense given that Congress intended for headstones and markers to commemorate the gallant dead and their contribution to the Nation, apparently regardless of whether the decedent's remains were available for burial or not.

But in 2016, VA diverged from its prior policy of defining applicants for both types of headstones and markers the same, and it failed to provide a satisfactory explanation for doing so.

First, in 2016, VA made the policy decision to significantly broaden the applicant classes for *burial* headstones and markers, explaining that newly stated purposes underlie VA's new policy, including, among others, ensuring that veterans with no family members are provided with a headstone or marker pursuant to the veteran's own wishes as expressed to personal representatives, as well as ensuring that non-family individuals (such as those interested in researching genealogy and military history), who wish to ensure lasting memorials to veterans, may apply for VA to provide a burial headstone or marker (with the caveat that the wishes of the family, if any, should be prioritized over the wishes of non-family in the case of veterans who served during World War I and thereafter).[6]

But VA failed to make any connection between (a) its new policy of restricting applicants for *memorial* headstones and markers to only family members and (b) the above-noted facts and circumstances raised by VA, albeit raised with respect to veterans whose remains are available for

---

[6] The Court again notes that the subsection concerning the definitions of applicant classes for burial headstones and markers is not at issue in this case.

20

burial. VA should have provided an explanation, because, for example, the Court is left wondering why veterans with no family members, whose remains are *not* available for burial, are not afforded the benefit of having their personal representatives implement their wishes after death. For another example, the Court is left wondering why non-family individuals who are interested in genealogy and military history and in ensuring that veterans with no family members who served before or since World War I are honored for their contribution to our country are precluded from applying to VA to provide such a place of commemoration for such a decedent simply because the decedent's remains are unavailable for burial.

Second, VA failed to provide a rational explanation for its connection between (a) its stated purpose that, like burial headstones and markers, a memorial headstone or marker provides a family with a physical site to mourn and remember the decedent, and (b) VA's choice that requests for memorial headstones and markers should be made only by family members, who are likely to want to memorialize someone whose life had specific meaning to them. VA's stated purpose (a), *which applies to both types of headstones and markers*, does not logically exclude all other possible purposes (e.g., the additional purposes that VA raised with respect to burial headstones and markers), given the absence of any explicit statement by VA that all other possible purposes are excluded for memorial headstones and markers.[7] Because VA's choice of policy (b) does not logically follow the facts and circumstances underlying its change of policy (a), VA failed to provide rational and sound reasoning for its new policy of restricting applicants for memorial headstones and markers to only family members to the exclusion of all others. The Court is also left wondering how this restrictive definition satisfies VA's stated policy of "strik[ing] an appropriate balance between protecting the interests of a decedent's family and ensuring the appropriate memorialization of veterans." Applicants for VA Memorialization Benefits, 81 Fed. Reg. 10,765-01, 10,769 (Mar. 2, 2016).

Third, VA failed to provide rational and sound reasoning for its policy change when it stated that "[t]he revised definition of applicant recognizes that VA is authorized to provide two types of headstones or markers." Applicants for VA Memorialization Benefits, 79 Fed. Reg. 59,176-01, 59,177 (Oct. 1, 2014). Without any further explanation by VA, the Court is still left

---

[7] Given that VA did not expressly exclude all other possible purposes, deducing that VA's single stated purpose (providing family a place to mourn and honor the decedent) necessarily excludes all other possible purposes is a logical fallacy. Specifically, such a deduction implicates the logical fallacies of "overlooking alternatives" and "false dilemma" (false dichotomy).

21

wondering why VA has defined "applicants" for memorial headstones and markers so restrictively compared to its definitions of the applicant classes for burial headstones and markers. Indeed, the two types of headstones and markers have always been considered different in nature by VA and by Congress, simply because burial headstones and markers are for veterans whose remains are available for burial whereas memorial headstones and markers are for veterans whose remains are not available for burial. So how does the distinctive nature of memorial versus burial headstones and markers connect to VA's choice to diverge from VA's prior policy of defining applicants for both types the same? And how does that choice relate to VA's acknowledgement that the two types of headstones and markers serve the same congressionally mandated purpose?

Why has VA changed its prior long-standing policy of defining applicants for both types of headstones and markers the same? We cannot know, because VA failed to provide a reasonable explanation for changing its policy and for adopting a far more restrictive definition of "applicant" for memorial headstones and markers as compared to burial headstones and markers. *See FCC v. Prometheus Radio Project*, 141 S.Ct. 1150, 1158 (2021).

The absurd result of the current policy under § 38.631(c)–for which the Court is precluded from supplying its own reasoned basis–is that when no surviving family member is available, the deceased service member and his or her contributions to our country remain unmemorialized, simply because that service member's remains are not available for burial. In light of the above, and given Congress's intent to commemorate the gallant dead in a manner commensurate with the dignity of their sacrifice (apparently without regard to whether or not the remains are available for burial), the Court cannot find that VA's attempt to reconcile its current policy with conflicting policies is a reasonable accommodation that Congress would have sanctioned. *Cf. Chevron*, 467 U.S. at 845.

As a result, the Court holds that § 38.631(c) is arbitrary and capricious, and the Court affords no deference to VA's policy decision underlying its promulgation of § 38.631(c). *See Encino Motorcars,* 579 U.S. at 222; *Chevron*, 467 U.S. at 844-45; *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Accordingly, the Court will invalidate § 38.631(c) (2021).

Because the Board relied on the invalid regulation in reaching its July 2019 decision, remand is required. *See Tucker v. West*, 11 Vet.App. 369, 374 (1998) (holding that remand is the appropriate remedy where the Board has incorrectly applied the law). In accordance with *Kutscherousky v. West*, 12 Vet.App. 369, 372-73 (1999) (per curiam order), Mr. Bareford is free

to submit additional arguments and evidence on remand, including any additional arguments he made to this Court; the Board must consider any such evidence or argument submitted. *See Kay v. Principi*, 16 Vet.App. 529, 534 (2002). The Court reminds the Board that "[a] remand is meant to entail a critical examination of the justification for the [Board's] decision," *Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991), and must be performed in an expeditious manner in accordance with 38 U.S.C. § 7112.

## III. CONCLUSION

Upon consideration of the foregoing, 38 C.F.R. § 38.631(c) (2021) is SET ASIDE; the July 1, 2019, Board decision is VACATED; and the matter is REMANDED for further development, if necessary, and readjudication consistent with this decision.

FALVEY, *Judge, concurring in part and dissenting in part*: Section 2306 provides that "[t]he Secretary shall furnish, when requested," burial headstones or markers for the unmarked graves of eligible individuals or, when the remains are unavailable, "an appropriate memorial headstone or marker for the purpose of commemorating an eligible individual." 38 U.S.C. § 2306(a), (b). VA has promulgated regulations, 38 C.F.R. §§ 38.630(c) and 38.631(c), establishing, respectively, who may request a burial headstone or memorial marker. I agree with the Court's summation of the facts and the parties' arguments in Sections I and II.A and its *Chevron* step one analysis in Section II.B.

But I do not join the Court's decision to then invalidate the regulations as arbitrary and capricious because it disagrees with VA's decision to create different standards for burial headstone versus memorial marker applicants. Courts apply the law, not make it. When a statute leaves a gap for an executive agency to fill, we must defer to a reasonable agency action as long as the agency has considered the relevant issues and provided a reasoned explanation. We must not substitute our own policy judgment for the agency's. Here, the Secretary's explanation shows that he made a reasonable choice after weighing the relevant considerations. Yet the Court rejects the Secretary's reasonable distinction between the applicant classes for burial headstones and memorial markers. Thus, I respectfully dissent from Sections II.C and III. of the Court's opinion.

I.

23

"Statutory interpretation begins with the words of the statute." *Mulder v. McDonald*, 805 F.3d 1342, 1345 (Fed. Cir. 2015) (citing *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002)). "When, as here, the Court is reviewing 'an agency's construction of the statute which it administers,' a court must first ask 'whether Congress has directly spoken to the precise question at issue.'" *Cox v. McDonald*, 28 Vet.App. 318, 323 (2016) (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842, (1984)). If we determine that Congress has spoken directly to the issue, we must adhere to the unambiguous meaning. *Cox*, 28 Vet.App. at 323. But if the statute is silent or ambiguous on the issue, the question then becomes whether the agency's interpretation is based on a permissible construction of the statute. *Id.* This is known as *Chevron* steps one (determining ambiguity) and two (determining permissible statutory construction). *See Buffington v. Wilkie*, 31 Vet.App. 293, 300-02 (2019), *aff'd sub. nom. Buffington v. McDonough*, 7 F.4th 1361 (Fed. Cir. 2021).

Here, the operative statutory sentence provides, "the Secretary shall furnish, *when requested*, an appropriate headstone or marker." 38 U.S.C. § 2306(a) (emphasis added). The subject of the sentence is "Secretary." The main verb or action is "furnish." But the adverbial phrase "when requested" lacks an explicit subject and verb. It is implied that the Secretary must furnish the headstone or marker at the time requested. But it is unclear who is making the request and the statute thus leaves ambiguity on this point.

This conclusion is bolstered by section 2306(c), which provides that "[a] headstone or marker furnished under subsection (a), (b), or (d) of this section may be of any material . . . requested by the person entitled to request such headstone or marker." 38 U.S.C. § 2306(c). Under this provision, Congress specified that some people are "entitled" to request a headstone or marker and, necessarily, some people are not entitled to make a request. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("[I]t is a commonplace of statutory construction that the specific governs the general."); *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) ("The expression of one thing implies the exclusion of others.").

II.

Because the statute is silent about who may request a headstone or marker, the Secretary may issue a regulation filling that gap. VA, as "'an agency that has been granted authority to promulgate regulations necessary to the administration of a program it oversees[,] may fill in gaps

in the statutory scheme left by Congress,'" and a regulation that does so is valid "'as long as the agency's action is reasonable and consistent in light of the statute and congressional intent'." *Sears v. Principi*, 349 F.3d 1326, 1329 (Fed. Cir. 2003) (first quoting *Contreras v. United States*, 215 F.3d 1267, 1274 (Fed. Cir. 2000) and then quoting *Disabled Am. Veterans v. Gober*, 234 F.3d 682, 691 (Fed. Cir. 2000)); *see also Cox*, 28 Vet.App. at 323 (citing *Chevron*, 467 U.S. at 842).

The question at hand is whether VA's gap-filling rules were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" so that the Court should hold them invalid under the Administrative Procedure Act. 5 U.S.C. § 706(2)(A). To pass "arbitrary and capricious" review, an agency decision must be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S.Ct. 1150, 1158 (2021).

In a recent unanimous decision, the Supreme Court stated that "arbitrary and capricious" review "is deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.* A reviewing court instead "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* The Supreme Court has also instructed that arbitrary and capricious review is a "'narrow'" standard and that courts should "'uphold [decisions] of less than ideal clarity if the agency's path may be reasonably discerned'." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (first quoting *Motor Vehicle Mfrs. Assoc. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); then quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 289 (1974)). Moreover, a court will not overturn an agency decision unless the agency

> "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Nat'l Assoc. of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

"Arbitrary and capricious" review gives significant deference to agency discretion. Much as when we apply the "rational basis" standard when reviewing constitutional questions, we need not agree with the course the agency has chosen. Indeed, we may have preferred any number of alternative paths. Even so, the relevant inquiry is simple: Was the agency's decision reasonable

and did the agency provide an adequate explanation that considered the relevant issues? *Prometheus Radio*, 141 S.Ct. at 1158.

III.

Here, the answer to both parts of the inquiry is yes. VA filled the statutory gap of who may request a burial headstone or memorial marker by defining "applicant" for each type of marker. 38 C.F.R. §§ 38.630(c), 38.631(c). The potential applicant pool for burial headstones is larger, including family members as well as several classes of persons unrelated to the deceased veteran. § 38.360(c). For memorial markers, on the other hand, only family members may apply. § 38.361(c). Although we may desire more people to be able to request memorial markers, the differentiation between the two applicant pools is reasonable.

Congress authorized VA to define applicant eligibility, and VA chose to prioritize the wishes of family members. *See Mayo Found. for Med. Educ. and Rsch. v. United States*, 562 U.S. 44, 59 (2011) ("Regulation, like legislation, often requires drawing lines."). When promulgating the regulations at issue, VA stated, "[O]ur intent, as much as possible, is to reserve to the family of the decedent decisions regarding memorialization." 81 Fed. Reg. 10,678 (March 2, 2016). Although VA restricted memorial marker applications to relatives alone, it allowed unrelated individuals to make burial headstone requests for veterans whose service ended before April 6, 1917,[8] and whose families' wishes would thus generally be harder to determine. 81 Fed. Reg. 10,768. ("[W]e chose to include a date after which we felt it will be more likely that living family members could be located and could provide input into the marking of a grave."). VA explained that it chose to differentiate the family-relation requirement for memorial markers and burial headstones because memorial markers are intended not to identify a burial site but to provide family members with a physical site to "mourn and remember their loved one" when remains are unavailable. *Id.* at 10,768-69. It reasoned that "requests for memorial . . . markers should be made by family members who are likely to want to memorialize someone whose life had specific meaning to them." *Id.* at 10,769. Memorial markers have a distinct, family-centric purpose not necessarily shared by burial headstones, which are placed at the location of the decedent's remains

---

[8] April 6, 1917, was the date the United States declared war on Germany and entered World War I. *U.S. Entry into World War I*, Office of the Historian, Foreign Service Institute, https://history.state.gov/milestones/1914-1920/wwi (last visited December 7, 2021).

rather than the family's chosen place of mourning. *See id.* Thus, it makes sense for relatives' wishes to be especially prioritized regarding memorial markers in a way they are not for burial headstones.

VA responded extensively to public comments about §§ 38.360(c) and 38.361(c), including Mr. Bareford's comments. *See id.* at 10,765-70. It addressed, among others, comments suggesting broader categories of applicants, that the previous applicant standard should be reinstated, that the applicant definitions should be eliminated, that date restrictions should be eliminated, and that non-relatives should be allowed to apply for memorial markers. *Id.* VA's responses repeatedly emphasized the prioritization of family members' wishes in the remembrance of their loved ones, especially regarding memorial markers, and explained why VA differentiated between burial headstone applicants and memorial marker applicants. *See id.* at 10,765-70.

Given VA's comments, it reasonably defined who may be an applicant for burial headstones versus memorial markers and adequately explained its reasoning for the differing eligibility. *See Prometheus Radio*, 141 S.Ct. at 1158. Thus, VA's decision warrants deference under the "arbitrary and capricious" standard and the Court should not invalidate the Secretary's regulations. *See id.*

We may believe that VA should have prioritized considerations other than family members' wishes when it promulgated these regulations. We may believe that, although VA was correct to prioritize family members' wishes, it should have done so in a different way. That, however, does not change the level of deference we owe to VA.

Yet, rather than defer to the Secretary's reasonable regulations, the Court mandates that requests for burial headstones and memorial markers be treated identically because they serve similar purposes. By emphasizing that "it is the veteran, not the family member, who is entitled to a headstone or marker," *ante* at 19, the Court dismisses VA's explanation that it sought to uniquely prioritize family members' wishes for memorial markers. But the issue here is not who is *entitled to* a headstone or marker. The issue is who may *request* a headstone or marker.

The Court implies that, because VA listed multiple policy considerations that informed its definition of the applicant class for burial headstones, the agency could not prioritize family members' wishes in defining the memorial marker applicant class unless it explicitly excluded all other possible considerations. *See ante* at 20-21. I fail to see how this follows. VA reasonably explained why it regarded family members' wishes as the primary consideration for memorial markers in a way it did not for burial headstones. What's more, our task is not to mandate complete

27

consistency in VA's policy choices or ensure that it specifically account for every plausible consideration. We need only ensure that the agency make a reasonable choice after considering the relevant issues. And it has done so here.

Moreover, by striking down the Secretary's regulations as arbitrary and capricious, the Court effectively requires that VA provide a burial headstone or memorial marker to *anyone*, without limitation, and that VA must do so no matter how many individuals or entities request a headstone or marker.[9] This is an absurd result not contemplated by the plain language of the statute.

IV.

The Court ably details the tragic deaths of veteran Roy H. Anderson and others and Mr. Bareford's noble and persistent efforts to memorialize those deaths. Despite these compelling facts, VA's regulations prescribing who may apply for burial headstones and memorial markers are not arbitrary and capricious, and the Court should defer to the Secretary's reasonable and reasonably explained regulations. Thus, I respectfully dissent.

---

[9] There are other statutory considerations and limitations concerning headstones or markers that are not at issue, such as where the individual is buried, who is an eligible deceased individual, and what constitutes unavailable remains of a deceased individual. *See* § 2306(a), (b).